<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                          :
TONY HOOD,                                :
                                          :
                    Plaintiff,            :
                                          :        Civ. A. No. 04-3836 (SRC)
v.                                        :
                                          :        **OPINION**
PFIZER, INC.,                             :
                                          :
                    Defendant.            :
_____:


<u>**Chesler, U.S.D.J.**</u>

     This matter comes before the Court on Defendant Pfizer's motion for summary judgment of the employment discrimination and retaliation claims brought by Plaintiff, Tony Hood (docket item #19).  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 and the motion has been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendant's motion for summary judgment is **granted** and Plaintiff's complaint is **dismissed**.


**I. BACKGROUND**

     Plaintiff, Tony Hood, initiated this action in New Jersey Superior Court, Law Division, Morris County, alleging employment discrimination and retaliation in violation of the New Jersey Law Against Discrimination (NJLAD).  Specifically, Plaintiff asserts that from February

2002 until his termination, Defendant, through Plaintiff's immediate supervisor Mark Kube "and others," discriminated against Plaintiff because of his race in violation of the NJLAD, N.J.S.A. 10:5-12(a).  (Complaint at ¶¶17, 41-55).  Plaintiff also contends Defendant retaliated against Plaintiff for his complaints of discrimination, also in violation of the NJLAD, N.J.S.A. 10:5-12(d).  (*Id.* at ¶¶ 28,41, 56-63).  Defendant subsequently removed this action pursuant to 28 U.S.C. §§ 1441, based on federal diversity jurisdiction, 28 U.S.C. § 1332, submitted its answer, and after the parties engaged in discovery, filed this motion for summary judgment.  The relevant facts, in a light most favorable to Plaintiff, the non-moving party, are as follows.

Plaintiff, who is African-American, was employed by Defendant, Pfizer, Inc., from August 22, 2001, until his termination on July 11, 2003.  (Complaint at ¶¶ 9-10, 40; Defendant's Statement of Undisputed Facts ("Df. St.") at ¶¶ 2, 61).  Throughout his employment at Pfizer, Plaintiff served as an Associate Product Manager in Pfizer Consumer Healthcare ("PCH"), a division of Pfizer, Inc., as a member of the Zantac team.  (Plaintiff's Brief ("Pl. Br.") at 3; Complaint at ¶10; Df. St. at ¶2-3).  As Associate Product Manager, Plaintiff's job duties included working on the marketing campaign for Zantac, an over-the-counter heartburn medication.  (Df. Br. at 4).

Bonnie Lidz, a Product Manager at PCH, hired and initially supervised Plaintiff.  (Pl. Br. at 3).  On December 1, 2001, Lidz commenced maternity leave and Plaintiff temporarily reported to Lidz's supervisor, Marketing Director Jean Bennett.  (*Id.*)  Neither Lidz nor Bennet reported any performance problems regarding Plaintiff during those first months, (*id.*), and Plaintiff stated that he "never had any problem with either of them."  (Plaintiff's Affidavit ("Pl. Af.") at ¶3).

In February 2002, Marc Kube transferred to Senior Marketing Manager of the Zantac

team and assumed direct supervision of Plaintiff.  (*Id.*; Pl. St. at ¶6).  According to Plaintiff, his

relationship with Kube became difficult within the fist month they worked together.  (Pl. Br. at

2).   However, Kube contends the only problems related to Plaintiff's poor performance.  Kube

asserts that when he began supervising Plaintiff, he periodically held "folder reviews,"[1] one-on-

one meetings with Plaintiff at which he reviewed Plaintiff's work assignments and the status of

his projects.  (Pl. Br. at 2).  After he had been supervising Plaintiff for "some time," Kube

expressed to Plaintiff, in these folder reviews, his concerns regarding the quality of Plaintiff's

work product and Plaintiff's failure to meet deadlines.  (Df. Br. at 6).  Kube also noted that at

some point colleagues had shared with him concerns about Plaintiff's performance and conduct.

(Kube cert. at ¶ 3).  Marion Wood, a Marketing Research Manager, advised Kube that Plaintiff

missed at least one deadline, another colleague expressed concern about Plaintiff's ability to

adequately manage a particular project, and a third colleague complained that Plaintiff had "cut

her off" at a group meeting when she attempted to present an view alternative to his.  (*Id.*)

Additionally, representatives of the advertising agency that worked with the Zantac team

complained to Kube about Plaintiff's performance and asked that Plaintiff be replaced on that

project.  (Kube Cert., ¶ 4).  Kube also asserts that Plaintiff refused to perform certain tasks that

were assigned to him, including the Zantac Brand monthly commentary reports and weekly "hot

sheets" detailing Plaintiff's priorities and their status, which Plaintiff only prepared sporadically.

(Df. Br. at 7-8).

Plaintiff, however, contends Kube did not express concerns about his performance until

---

[1] Defendant explained that "folder reviews" are meetings at which employees were
expected to update their supervisors with respect to their projects and work load, or to raise any
issues or difficulties regarding projects or deadlines.  (Df. Br. at 6).

his 2002 performance review meeting, approximately a year after he had been reporting to Kube. (Pl. Dep. at 82:13-15, 104:16-23). Plaintiff asserts that Kube discriminated against him by "withholding . . . certain support, resources, training opportunities,[2] communications and information that [Plaintiff] required in order to accomplish the goals and objectives of his position." (Complaint at ¶ 17). Plaintiff further contends that while reporting to Kube, he "encountered a series of subtle discriminations." (Pl. Br. at 2; Pl. Af. at ¶5; Complaint at ¶15).

First, Plaintiff argues that "more often than not" Kube cancelled or simply did not appear for their periodic folder reviews. (Pl. Br. at 2). According to Plaintiff, Kube's failure to attend the folder reviews prevented Plaintiff from seeking Kube's advice and from keeping Kube up to date on the status of Plaintiff's work. (Pl. Aff. at ¶ 6). Plaintiff conceded that he did attend some meetings with Kube to discuss the status of his various projects, but Plaintiff contends that in those meetings Kube never informed Plaintiff that he was not adequately performing his position. (Pl. Dep. at 82:13-15).

Plaintiff asserts Kube avoided contact with him by instead communicating with Wood, and Plaintiff's subordinate, Assistant Project Manager, Robert Weitzenhofer, both of whom are white. (Pl. Aff. at ¶ 6). Kube passed information necessary for Plaintiff to perform his job "competently, completely, and effectively," to Weitzenhofer rather than speaking to Plaintiff

---

[2]The Court notes that Plaintiff does not address any training opportunities denied to him in opposition to this motion for summary judgment. However, the record indicates that in deposition, Plaintiff identified only one training opportunity that he was denied, a three to five day management course entitled "Leading Edge," which Plaintiff described as "a managerial type training seminar . . . . typically attended by individuals who manage people." (Pl. Dep. at 48:17-25, 51:4-22, 54:2-8). At the time, Plaintiff did not manage any employees, and although he was initially granted approval to attend, Kube later instructed him not to do so. (*Id.* at 51:3, 54:11-15).

directly; reassigned Plaintiff's projects to Weitzenhofer without informing Plaintiff; and

bypassed Plaintiff for information relating to Plaintiff's projects.  (Pl. Br. at 2; Pl. Aff. at ¶¶ 5-6).

      Plaintiff also contends Kube did not provide clear guidance and therefore, Plaintiff's

responsibility for various projects was "blurred and unclear."  (Pl. Br. at 2).  Moreover, Kube did

not coach Plaintiff to improve his performance and Kube did not participate in the "several

critical meetings which Kube swears to."[3]  (Pl. Br. at 3).  Plaintiff further contends he did not

miss any deadlines, but explained that on one occasion a project was completed after the original

deadline due to problems getting information from team members, and about which he kept

Kube informed and sought Kube's advice.  (Pl. Dep. at 97:12-99:16).

      In May 2002, Plaintiff spoke to Vice President Linzell Harris, who Plaintiff believed to

be the highest-placed African-American Pfizer employee.  (Pl. Aff. at ¶ 7).  Plaintiff advised

Harris that he was concerned about the manner in which Kube treated Plaintiff, the work

environment Kube created, and the lack of support Plaintiff received from Kube.  (Pl. Aff. at ¶ 7;

Pl. Br. at 3).  According to Plaintiff, Harris advised him to speak to Kube about his concerns and

to remind Kube of the experience Plaintiff brought to the team.  (Pl. Aff. at ¶ 7).  The record does

not indicate if such a conversation between Plaintiff and Kube ever occurred.

      In July 2002, Plaintiff attended a mid-year performance review meeting with Kube, and

although the meeting was scheduled for a full hour, it lasted approximately fifteen minutes.

(Feher Cert., Ex. D; Pl. Aff. at ¶ 8).  Plaintiff's notes from the meeting indicate Kube counseled

---

[3]Plaintiff does not make clear which meetings he contends did not occur.  Kube and
Plaintiff agree that some folder reviews were cancelled, but that they did meet on occasion.
Neither Plaintiff's nor Defendant's submissions make clear the frequency with which the folder
reviews were held or cancelled.  The formal meetings that Plaintiff reported are set forth in this
opinion.

Plaintiff regarding several "development area[s]," advising Plaintiff to "sell [him]self more," that Kube needed to see what Plaintiff was working on, and that he needed to see more of Plaintiff. (Feher Cert. Ex. D; Pl. Dep. at 106:1-107:1).  Plaintiff agreed with Kube and advised him this could be accomplished if Kube attended their scheduled folder reviews.  (Pl. Aff. at ¶ 8). According to Plaintiff, Kube did not discuss Plaintiff's performance at this meeting.  (Pl. Dep. at 107:2-5).

In September 2002, Plaintiff again complained to Harris about his relationship with Kube. (Pl. Br. at 3).  Plaintiff's complaints to Harris mirrored complaints made by two of his colleagues, who were also African-American – that Kube withheld important information from him and that Kube left Plaintiff "out of the loop" with regard to information and in decision making processes.[4]  (Pl. Br. at 3-4).  Plaintiff asserts that, despite the requirements of Pfizer's "open door policy," Harris did nothing in response to Plaintiff's complaints.  (Pl. Br. at 3).  The Court notes that, although Plaintiff contends that he "complained to Harris about what he perceived as Kube's racial bias," and that "Harris did not deny that Plaintiff complained to him about being treated differently," (Plaintiff's Counter-Statement of Material Facts ("Pl. F.") at ¶ 9),  Harris stated in deposition that he did "not remember having any conversation with [Plaintiff] where he said he was being treated unfairly because of his race."  (Harris Dep. at 130:13-15).

_____

[4]Specifically, Plaintiff states in his brief that his complaints were identical to those made by Celia Sloan and Joanna Reddick.  (Pl. Br. at 4).  According to Plaintiff, Reddick, who was a member of the MBA recruiting team when Kube ran the recruiting program, complained that Kube "left her out of the loop" of information and in the decision making process.  (Pl. Br. at 3-4).  Plaintiff also reported that Sloan, who had served as an Assistant Product Manager under Kube, complained to Harris that Kube withheld important information from her and bypassed her in communications.  (Pl. Br. at 3).

In late 2002, Plaintiff attended a company-wide meeting hosted by Mark Robinson, President of CHP.  (Pl. Br. at 4).  Pfizer held these meetings two or three times a year, where various topics, including racial diversity were addressed, and at which the attendees were welcomed to present questions and comments.  (*Id.*; Complaint at ¶ 24.)  Plaintiff availed himself of the opportunity, and went to the podium where he asked Robinson why the company did not do more to promote diversity within the CHP unit.[5]  (Pl. Br. at 4).  Robinson asked Plaintiff to repeat the question twice, but did not provide an answer.  (*Id.*)  Subsequently, Harris referred to Plaintiff as "Mr. Diversity," which Plaintiff considered insulting.[6]  (Id.)  Plaintiff also asserts Harris "chastised" him for the statement, explaining that a few days after the meeting Harris called Plaintiff into his office and told Plaintiff that his "question was inappropriate and that [he] had embarrassed Mr. Robinson because Robinson felt that [Plaintiff] had put him on the spot."  (Pl. Aff. at ¶ 10).

Around this time, on December 13, 2002, Plaintiff attended a meeting with Kube regarding his bonus eligibility, at which Kube addressed certain topics they would discuss more

---

[5]In the Complaint, Plaintiff simply states that he asked the speaker about Pfizer's diversity strategies.  (Complaint at ¶ 24).  Plaintiff's former colleague, Margaret Gilchrist explained in deposition that Plaintiff asked about diversity and what the company was doing about diversity.  (Gilchrist Dep. at 55:16-18).  Gilchrest stated Plaintiff had to repeat his question three times, but she did not know whether Robinson could not hear Plaintiff, or if he chose not to hear Plaintiff.  (Id. at 55:19-25).  In any event, Gilchrist described the event as "uncomfortable" and stated Robinson "deferred the answer . . . to Peter Wentworth who gave . . . the standard answer . . . diversity [is] important to the company[.]" (Id. at 56:1-6).

[6]In Plaintiff's brief, he states that "some of his colleagues" referred to him as "Mr. Diversity," but does not identify who used this statement.  (Pl. Br. at 4).  However, in Plaintiff's affidavit in support of his opposition to this motion, he only states that Harris referred to Plaintiff as Mr. Diversity, (Pl. Aff. at ¶ 11), and in deposition he stated that no one other than Harris referred to him as such.  (Pl. Dep. at 132:5-7).

fully in Plaintiff's performance review meeting.  (Feher Dec., Ex. E; Pl. Dep. at 107:12 - 108:19).

At the meeting Kube advised Hood that he "need[ed] to be more of a team player."  (Feher Dec.,

Ex. E; Pl. Dep. at 108:20-109:6).  Kube also commented on Plaintiff's communication skills and

advised Plaintiff to attend writing courses and Toastmasters.  (Pl. Dep. at 95:21-96:2).  Plaintiff

did attend a writing workshop, which Kube had suggested, and a seminar related to marketing;

however, Plaintiff chose not to attend Toastmasters.  (Pl. Dep. at 96:10 - 96:23).  Plaintiff's notes

further reflect that Kube raised concerns regarding Plaintiff's performance with respect to

Ship/Share, an inventory system that matches shipments to production and retail sales, for which

Plaintiff was responsible.  (Feher cert., Ex. E; Df. Br. at 9).

  Plaintiff asserts that, in January 2002, he made numerous attempts to meet with Kube to

discuss his 2002 performance review, but Kube purposely avoided conducting the review until

February 2003.  (Complaint at ¶¶ 31-31).  However, Plaintiff also testified in deposition that he

did not recall ever scheduling an appointment with Kube through Kube's Outlook calendar, to

which Plaintiff had access.  (Pl. Dep. at 227:15-24).  At some point in late January 2003 Kube

and his supervisor, Group Marketing Director Jeremy Puttock, met with Plaintiff to address

Kube's concerns regarding Plaintiff's performance.[7]  (Pl. Br. at 4; Conliffe Dep. at 57:19-58:1).

At the meeting Kube presented a document highlighting his concerns regarding Plaintiff's

performance.  (Pl. Dep. at 72:13-25).  At the conclusion of the meeting, Kube and Plaintiff set a

---

   [7] Plaintiff also stated that, in course of the meeting, Puttock explained that "Paul had spoken with him and they wanted to meet to address any concerns that was [sic] raised regarding my performance, the e-mail that I discovered regarding my performance review."  (Pl. Dep. at 72:13-19).  Neither Plaintiff nor Defendant mentions this e-mail regarding Plaintiff's performance review in their briefs and there is no other reference to the e-mail in the record.

date in

February 2003 to discuss Plaintiff's 2002 performance review.  (Pl. Dep. at 75:9-15; Df. Br. at

10).

On or around February 26, 2003, Kube and Plaintiff met to discuss Plaintiff's written

performance review for 2002.[8]  (Kube Cert., Ex. B; Pl. Dep. at 75:21-25).  The written

performance review outlines Plaintiff's goals for 2002, as proposed by Plaintiff and approved by

Kube in early 2002.  (Pl. Dep. at 77:7-78:7; Def. Br. at 11; Kube Cert. Ex. B at 1-5).  The report

also includes Plaintiff's statement of his key results against his goals, which Kube accepted, as

well as four additional sections drafted by Kube: Manager's Summary of Results versus Goals;

Leader Behaviors; Manager's Comments; and Colleague's Ratings.  (Def. Br. at 11; Kube Cert.,

Ex. B).

In the "Manager's Summary," Kube rated Plaintiff's performance as "Commendable"[9] in

three of the five goals reviewed, noting that Plaintiff "produc[ed] good results on a number of his

projects," specifically identifying several accomplishments.[10]   (Kube Cert., Ex. B at 6).  For the

two remaining goals, Kube rated Plaintiff's performance as "Needs Improvement" and

---

[8]The Court notes that although the parties agree that Plaintiff and Kube met to review the
document in February of 2003, both Plaintiff and Kube signed the document on April 28, 2007.
(Kube Cert., Ex. B).   The parties do not provide explanation for the discrepancy.

[9] The possible ratings throughout the written performance review are, from lowest to
highest: Unacceptable, Needs Improvement, Commendable, Exceeds Expectations, and
Exceptional.  (Kube Cert., Ex. B).

[10]Notably, Plaintiff challenged one of the noted accomplishments as incorrect, explaining
he did not guide the Zantac package design through A-R-C, because the project "was given to
[Weitzenhofer]," noting also that he was never informed the project had been reassigned.  (Pl.
Dep. at 85:10-87:4.)

"Unacceptable." (*Id.*) Kube noted Plaintiff "had difficulty completing a number of milestones for [certain] projects in a timely fashion," citing two specific examples. (*Id.*) Kube also stated Plaintiff did not "significantly contribut[e] to the brand's operating plan development," explaining Plaintiff "had difficulty coordinating team members' inputs," that he "struggled to write the executive summary section" of the Operating Plan, and he "had difficulty contributing to the development and ARC approval" of the advertising campaign. (*Id.*)

In the "Leader Behaviors" portion of the performance review, Kube rated Plaintiff's performance as "Commendable" in four of the eight areas identified, including: "Create an Inclusive Environment"; "Develop People"; "Align Across Pfizer, Inc."; and "Demonstrate Strategic Agility." (*Id.* at 7). However, Kube indicated Plaintiff "Need[ed] Improvement" in the remaining four leader behaviors: sustaining focus on performance, encouraging open conversation and debate, managing change, and demonstrating strategic agility. (*Id.*) However, this section provided no specific examples or critiques of Plaintiff's performance in these areas.

Finally, in the "Manager's Comments," Kube commended Plaintiff's analytical thinking skills and his ability to work independently, but noted Plaintiff had "struggled to become a consistently contributing member to the team," citing missed deadlines and Plaintiff's need for "considerable guidance and follow up . . . moving key projects forward[.]" (*Id.* at 8). Kube also indicated Plaintiff needed to improve his presentation and writing skills, his communication with colleagues and supervisors, as well as his willingness to be a team player. (*Id.* at 8-9). Kube provided specific examples of Plaintiff's performance, both positive and negative, and where improvement was needed, set forth steps Plaintiff had been asked to take to improve in those areas. (*Id.*) Kube noted that he had discussed with Plaintiff "his difficulties . . . in the areas of

-10-

performance, his communication skills, and his interpersonal skills," and that "[t]hroughout the year [he had] expressed" to Plaintiff the "need for him to become a more active contributor to the brand team." (*Id.* at 8).

The aggregate review indicated Plaintiff "Need[ed] Improvement" and identified the following areas in which Plaintiff needed to immediately improve: "1) Managing and organizing multiple projects on a consistent basis, and providing the quality timeliness of work submitted. 2) Working with less supervision and with a sense of urgency and ownership around priorities. 3) Continuing to improve presentation and writing skills.  4) Adopting a more collaborative work approach when dealing with team members."  The report noted that Kube would continue to monitor Plaintiff's progress and be available to assist Plaintiff, (*id.*)  and at the close of the meeting, Kube advised Plaintiff that he would be placed on a Performance Improvement Plan ("PIP").  (Pl. Dep. at 104:5-23).

Plaintiff signed the performance review on April 28, 2007, noting that he did "not agree with the review."  (Complaint at ¶ 33).  Plaintiff now argues the performance review was "inaccurate and unjustified," and asserts all of the performance shortcomings cited in the performance review are inaccurate.  (Pl. Dep. at 82:3-102:25).  Plaintiff further argues Kube modified Plaintiff's goals, and the weight assigned to the various goals, in December 2002.  (*Id.* at 78:8-80:5).  Although Plaintiff took no issue with the modification of his goals, he "believe[s]" he expressed concern to Kube that two projects should have been reviewed separately, rather than together, in order to provide proper weight to his performance in each.  (*Id.*)

After Plaintiff received his performance review, he met with Deborah Conliffe in Human

Resources, who is also African-American, to submit a formal complaint of racial bias.[11]  (Pl. Br. at 4; Pl. Dep. at 117:20-118:11).  Plaintiff asserts that he complained that he believed his performance review was unjustified and racially motivated, and requested Conliffe speak to certain individuals, including Ileana Alexander and Dawn Parkin, regarding the manner in which Kube treated Plaintiff.  (Pl. Dep. at 118:5-23).  At some point Plaintiff also expressed his concerns regarding his performance review to Elizabeth Loder, another Human Resource representative, explaining that he believed his review was unjustified and that Kube had treated him improperly throughout the year.[12]  (Pl. Dep. at 121:9-122:19).  Loder advised Plaintiff that she would speak to Conliffe about his concerns.  (*Id.* at 122:11-14).  Conliffe testified that Plaintiff first spoke to Loder, but the complaint was referred to Conliffe to investigate; she did not note the date of the initial complaint.  (Conliffe Dep. at 105:10-16).

Conliffe reviewed the complaint and conducted an investigation, in the course of which she interviewed employees who worked with both Kube and Plaintiff: Weitzenhofer, Assistant

---

[11]The Court notes that Defendant argues that Plaintiff "did not claim to Conliffe that his issues with Kube were related to his race." (Df. Br. at 13).  Conliffe's limited deposition transcript indicates that Plaintiff "complained that he wasn't being treated fairly by [Kube]" and that he felt that "he was treated differently," and that Plaintiff "mentioned unfair treatment" but he "never mentioned hostile work environment" to Conliffe. (Conliffe Dep. at 11:1-7, 110:14-17).

[12]Plaintiff does not make clear when he spoke to Loder.  Plaintiff asserts in his brief that he complained to Loder "[a]lmost immediately" after the meeting with Kube and Puttock, and in an unsigned affidavit submitted in support of Plaintiff's brief in opposition to summary judgment, he states that he met with Loder before his performance review.  (Pl. Br. at 4; Pl. Aff. at ¶ 13).  However, at deposition, Plaintiff could not recall if he spoke to Loder before or after he spoke to Conliffe, but he believed he spoke to her in March, which would have been after the meeting to discuss the performance review; he also testified that he complained to Loder about the "performance appraisal," again indicating the meeting occurred after he had been advised of the negative review.  ( *Id.* at 121:11-23).

Project Manager in the Zantac group; Wood, who worked with the Zantac group as a strategic partner and market research expert; Reddick, who was a friend of Plaintiff's and who had worked with Kube on Pfizer's MBA employee recruitment campaign; and Harris, Vice President of Market Operations.  (Conliffe Dep. at 15:11-16:13, 68:12-25, 142:20-143:5; Df. Br. at 15) Conliffe conducted these interviews in person within the week following Plaintiff's complaint. (Conliffe Dep. at 22:11-25).

Weitzenhofer and Wood both reported generally positive experiences with Kube.  (*Id.* at 24:6-11).  Weitzenhofer, like Plaintiff, complained that Kube missed folder reviews, but noted that at some point Kube changed his scheduling system to improve his attendance.  (Feher Cert., Ex. H).  Wood explained Kube preferred to delegate tasks, but that he would resume responsibility for a project if he felt the employee was not performing.  (Conliffe Dep. at 143:20-25).  Wood also noted that on at least one occasion Kube took over a meeting for Plaintiff because he felt Plaintiff was "not moving things forward," and Wood believed Kube had concerns about Plaintiff's ability to manage meetings.  (*Id.* at 144:18-145:24).

Reddick and Harris provided more critical feedback.  Reddick, who led the Howard University MBA recruitment team reported feeling that Kube was not supportive of efforts to recruit from Howard University, and she believed he enforced an "obvious double standard . . . dealing with [recruiting at] Howard University."  (Feher Cert., Ex. K).  Exemplifying this double standard, Kube had advised Reddick and Celia Sloan that he did not "trust the interviewers" Reddick's team had selected and encouraged her team to use the interviewers selected for the other teams.  (*Id.*)  Kube cautioned Reddick and Sloan that if they did not heed his advice, he would hold them accountable for the interviewers selected by their team, and Reddick believed

-13-

that Kube did not hold the other team leaders accountable for their interviewers. (*Id.*) At some point, in response to a request from a recruitment team leader for another school, Kube asked Reddick if she would consider transferring recruiters who were minorities from her team to other teams that had no minority team members, which Reddick declined to do. (*Id.*) Reddick also expressed some concern regarding Kube's management style, explaining he would "often confront and then back off," that he did "not really interact with anyone," and he did not permit "[h]is direct reports . . . to make decisions or take on ownership roles with any projects." (*Id.*) Furthermore, Reddick often assisted Sloan, who reported to Kube, because she believed Kube did not keep Sloan "in the loop" and that Kube failed to provide Sloan adequate guidance and direction. (*Id.*)

Conliffe's hand-written notes from her meeting with Harris indicate that Harris spoke to Plaintiff on at least four occasions. (Cotz Cert., Ex. F). The first two meetings appear to be irrelevant to this motion. The first related to Plaintiff's commute and his decision to buy a new house, and the second related to Plaintiff's interest in another position. (*Id.*) At the third meeting, Plaintiff discussed a "problem with Marion Wood," however the remaining notes on that issue are not clear. (*Id.*) At the forth meeting, Plaintiff apparently made comments about Kube's failure to communicate. (*Id.*) Conliffe's notes also indicate that Celia Sloan had made similar complaints to Harris about Kube's management style – that he did not communicate, took over meetings, and he discounted her opinion. (*Id.*) Conliffe also noted that "all non-minority colleagues love him [and] spoke highly of him," and she wrote: "Not a good track record with regard to minority colleagues." (*Id.*) In deposition Conliffe attributed the latter statement to Harris, explaining the statement did not reflect her perception. (Conliffe Dep. at 78:24-79:25).

-14-

She further explained that the comment was "not so much about Marc Kube" and "not specifically directed towards Mr. Kube," but rather that it was stated "in context [of] . . . what [Pfizer] need[s] to do as an organization to . . . retain minority colleagues." (*Id*. at 91:13-24). The remainder of the notes from that meeting are not clear. (*Id*.)

Conliffe also investigated whether there had been similar complaints against Kube, and found there had been none. (*Id.* at 16:14-25). She also spoke to Kube, who explained he did cancel folder meetings with Plaintiff due to conflicts with other meetings. (*Id.* at 19:3-20:10). Kube also reported that he took over a presentation that he had originally assigned to Plaintiff because he felt Plaintiff did not understand what he needed to do and Plaintiff was not completing the project in a timely fashion, despite numerous discussions about the assignment with Kube and Wood. (*Id.* at 20:11-22:3).

After completing the investigation, Conliffe concluded that Kube needed to develop certain areas of his management style, but found that Plaintiff had not been treated unfairly. (*Id.* at 49:1-17). Loder explained that "[t]here were some concerns and conversations about behaviors perceived as [Kube] having some difficulties managing people of color," and explained that the conversations she had with Conliffe and Puttock "were around the need for [Kube] to be more comfortable with managing people that were different than his own." (Loder Dep. at 280:6-17). However, the group further concluded Kube was averse to handling conflict with anyone, regardless of race, and needed to develop this skill. (*Id.* at 280:17-20).

Conliffe did not write a formal report, but after speaking with Puttock, they agreed Kube would benefit from working with an executive coach to improve his management style. (*Id.* at 52:2-8; 57:15-58:4). The recommendation was not mandatory and Kube was not placed on a

PIP, however, Kube did agree to work with a coach.  (*Id.* at 50:24-51:14; 58:4-16).   Conliffe also

met with Plaintiff to advise him she had completed the investigation.[13]  (Pl. Dep. at 120:6-8).

Conliffe informed Plaintiff that his concerns had been "addressed and resolved," but Conliffe

declined to provide Plaintiff any further detail.  (*Id.* at 120:7-121:4).

      After the performance review meeting, Kube drafted a PIP outlining specific areas in

which Plaintiff's performance required improvement and specific expectations to meet those

objectives.  (Kube Cert, Ex. C).  The performance areas enumerated in the PIP mirror the areas

identified as needing improvement in the written performance review and discussed at the

meetings in July and December 2002.  (Kube Cert., Ex. B, C; Feher Cert., Ex. D, E).  On April

14, 2003, approximately seven weeks after the performance review meeting, Loder and Kube met

with Plaintiff to discuss the PIP.  (Pl. Dep. at 135:12-15).  Kube and Loder supervised Plaintiff's

performance on the PIP, which began upon presentation and ran sixty days through June 12,

2003.  (Kube Cert., Ex. C at 3; Pl. Br. at 5).  At the meeting, Plaintiff again protested that the PIP

was not justified.  (Pl. Dep. 135:19-25).  Plaintiff also contends Kube purposefully delayed

presenting the PIP until April in order to have the PIP align with Pfizer's acquisition of

Pharmacia, and the related hiring freeze, so that Kube could replace Plaintiff after the sixty-day

PIP.  (Complaint at ¶ 36; Pl. Dep. at 133:1-25).  However, Plaintiff also testified that the hiring

freeze had ended by the time he began his PIP on April 14, 2003, therefore, Kube would have

been able to replace Plaintiff even if he had begun the sixty-day PIP immediately after the

performance review meeting on February 26, 2003.  (*Id.* at 135:3-11).

_____

    [13]The record does not make clear when Conliffe met with Plaintiff to report her findings,
or when she met with Kube about working with a coach.

Kube reported that during the PIP, he continued to meet with Plaintiff and provide him with feedback, but Plaintiff's performance did not improve.  (Kube Cert. at ¶ 13).  Plaintiff, however, "felt that [Kube] continued to avoid giving him the support, guidance and input he needed to improve and succeed."  (Pl. Br. at 5).  Plaintiff concedes that he "discussed the status of projects" with Kube during the sixty-day period, but contends that during that time Kube never advised him that he was failing to properly manage projects or that he was not meeting the objectives of the PIP.  (Pl. Dep. at 144:17-23).  Nevertheless, sometime after being placed on the PIP, but before his termination, Plaintiff began to look for other employment because he believed "the writing was on the wall," meaning he believed termination was imminent, because, once placed on a PIP, "individuals rarely, rarely are successful in overcoming a PIP."  (Id. at 168:12-169:5).  However, Defendant points out that Weitzenhofer had been placed on a PIP in 2002 and was not terminated.  (Feher Cert., Ex. J).

At or near the end of the sixty-day PIP, Kube drafted a memorandum, dated July 11, 2007, addressed to Plaintiff and summarizing and comparing his performance to the expectations set forth in the PIP.[14]  (Pl. Dep. at 16-22; Kube Cert., Ex. D).  The memo provides specific examples where Kube found Plaintiff had failed to meet the objectives outlined in the PIP, including the following: (1) Plaintiff submitted a "key issues deck" approximately three days late, leaving no time for Kube to review and discuss revisions with Plaintiff; (2) Plaintiff twice

---

[14]Plaintiff does not make clear whether Kube provided him a copy of the memorandum at the July 11, 2003 meeting.  In deposition Plaintiff explained that he was advised the meeting was to address his PIP, and only after he arrived did he learn that Kube had drafted the memorandum "that had not been shared with [him] whatsoever stating that I had not met the criteria of the PIP and [his] employment had been terminated."  (Pl. Dep. at 4:16-22).  Plaintiff later identified the memorandum, stating he was not provided a copy of the document on July 11, 2003, nor did he recall receiving a copy after the meeting.  (Id. at 145:2-9).

submitted inaccurate monthly reports and failed to correct errors identified by Kube; (3) Plaintiff

did not adequately prepare to present the key issues deck to upper management and therefore

only presented a portion of the final deck; (4) Plaintiff had difficulty writing the brand message

for a particular project, had trouble explaining the goals of the program and the business rationale

at a meeting, "had difficulty" requesting assistance from Kube, and attempted to delegate the task

to another group; (5) Plaintiff had difficulty summarizing the key action steps in the brand's

monthly sales commentary, requiring extensive input and direction from Kube and, in one

instance, utilized the same action steps from the commentary drafted the month prior; (6)

Plaintiff did not timely begin his assignments and therefore submitted urgent requests for

information, forcing other colleagues "to scramble to meet [Plaintiff's] deadlines," once waiting

twelve days to ask for inputs that had to be delivered the following day; and (7) rather than

immediately calculate the 2004 market share for Zantac, as requested by Kube, Plaintiff argued

the project should be delegated to another colleague "better suited to calculate the market share,"

and "[a]fter repeated follow-ups" by Kube, Plaintiff only partially completed and delivered the

project a month after the information was sought.  (*Id.*)

Plaintiff only challenges some of the information outlined in the memorandum as

incorrect.[15]  Plaintiff does not contest that he submitted the key issues deck late, he simply states

Kube did not inform him the document required significant revisions.  (Pl. Dep. at 146:6-13).

Plaintiff also concedes that one number in one report was inaccurate, because the current figure

was not available, but he asserts that he discussed this with Kube, who agreed that Plaintiff

---

[15]Notably, Plaintiff does not outline his position with regard to the specific allegations in
his brief opposing this motion, rather he did so in deposition, the partial transcript of which was
provided to the Court by Defendant.

should simply wait to "update those columns of numbers" in the next reporting cycle. (*Id.* at 147:6-148:6). Plaintiff challenges Kube's allegations regarding the presentation of the key issues deck, explaining Kube informed him of the Tuesday rehearsal the Friday before the event, and only after Plaintiff had left work to go to the airport for a planned family trip, of which Kube was aware. (*Id.* at 148:7-149:23). Plaintiff advised Kube and the team that he was away from home and did not have the materials, and therefore, would not be able to adequately prepare; on the day of the presentation, Plaintiff contends Kube insisted, against Plaintiff's objections, that Plaintiff only present a portion of the deck and that Kube would present the remainder. (*Id.* at 149:19-150:25).

On July 11, 2003, around noon, Loder and Kube met with Plaintiff and informed him that he had failed to meet the performance objectives set forth in the PIP and therefore, Defendant terminated his employment. (Pl. Dep. at 3:24-4:14; 168:9-11). Upon being advised of his termination, Plaintiff abruptly left the meeting in the "midst of the conversation." (Loder Dep. at 160:3-10, 243:2-10; Df. Br. at 25). Before Plaintiff left, Loder and Kube advised Plaintiff to hand in his key card and any other Pfizer property. (*Id.* at 161:17-20). Plaintiff did turn over his key card, but after walking out of the meeting, Plaintiff took the Pfizer laptop that had been issued to him and quickly left the building. (Loder Dep. at 160:14-161:22). After Plaintiff left, Loder spoke to her supervisor, who advised Loder to ensure that Plaintiff did not leave with any proprietary information. (*Id.* at 161:2-7). Loder and Kube then went to Plaintiff's office and the parking lot attempting to speak to him again, but he was gone. (*Id.* at 161:7-14).

Later that night, at approximately 7:30 p.m., Plaintiff returned to the Pfizer facility and attempted to enter building. (*Id.* at 157:18-25). However, because Plaintiff had surrendered his

-19-

key card, he had to speak to a security officer to gain access.  Plaintiff identified himself as an

employee and told the security officer that he needed to get something from his office.  (*Id.*

162:21-165:2). He explained that he had lost or forgot his key card and instead presented his

driver's license. (*Id.*)  The security guard did not allow Plaintiff to enter the facility and contacted

Loder at home to advise her of the incident.  (*Id.* 162:15-1633:1, 170:1-3).  Plaintiff concedes

that he attempted to enter the building, but asserts he did so only to return the laptop computer

that he had removed from the facility "out of habit."  (Pl. Aff. in Opp. to S.J. at ¶ 18).  However,

Plaintiff did not give the laptop to the security officer and, according to Loder, the security

officer did not report that Plaintiff had his laptop when he attempted to enter the building.

(Loder Dep. at 244:14-245:16).

Sometime the following week Plaintiff's photo was posted in the security console at the

entrance to the Pfizer facility.[16]  (*Id.* at 170:13-20).  Loder estimated the photo was approximately

three by five inches in size,[17] and explained it was not visible to people entering the facility, but

may have been visible to those walking out of the facility, past the console.  (*Id.* at 171:5-23,

2290:18-23).  Loder is not aware, nor does the record indicate, who posted the picture or how

long it was present, but Loder assumes security personnel posted the photo and she saw it again,

along with two other photos, around December 2003.  ( *Id.* at 172:1-173:1, 233:10–17, 235:8-

---

[16]The record indicates there are two entrances to the Pfizer facility located in Morris
Plains, New Jersey – one facing the parking lot, and another facing Route 53.  The record does
not make clear if Plaintiff's photo was displayed at one or both entrances.

[17]Without identifying a source, Plaintiff states in his brief that "in December 2003, Loder
saw . . . a 5x7 blow-up of Plaintiff's ID photo . . . posted at the security stations."  However,
Loder's deposition transcript, as provided by Defendant indicates she estimated the photo of
Plaintiff was three by five inches.  Because Plaintiff points to Loder's perception of events, the
Court will rely on Loder's deposition transcript.

11).  The additional photographs displayed were of Gerald Cauley, who is African-American and who Loder believed left the company because of health reasons in February 2003, and a Caucasian male, with whom Loder was not familiar.  (*Id.* at 235:8-236:16, 241:2-24).  Loder explained that pictures are typically placed in the security console when there is a concern that a former employee who has been terminated may attempt to enter the building; she believed Plaintiff's picture was posted because he had attempted to enter the building the evening after he was terminated, but she did not know why the photos of Cauley or the third male were posted. (*Id.* at 235:8-236:16, 241:2-242:18).

   After Plaintiff's termination, Conliffe contacted him by letter on two separate occasions, July 14, 2003, and July 21, 2003.  (Feher Cert., Ex. F-G).  In the letters Conliffe noted that because Plaintiff abruptly left the meeting on July 11, 2003, Loder and Kube did not have opportunity to discuss severance benefits with him and advised Plaintiff to contact her to discuss this and other benefits.  (*Id.*)  Conliffe also notified Plaintiff that he had to return the laptop, which he did when he met with Loder on July 25, 2003.  (*Id.*; Df. Br. at 25).  At the July 25, 2003 meeting, Conliffe apparently offered Plaintiff a severance package contingent upon Plaintiff signing, within a limited time, a release of liability against Defendant.  (Pl. Dep. at 29:1-30:24; Df. Br. at 26).  This offer of benefits and severance options is also reflected in a letter to Plaintiff dated July 23, 3003.  (Feher Supp. Cert., Ex. D).  The letter indicates that Plaintiff's official termination date would be August 8, 2003, and that he would continue to receive his full salary until that date.  (*Id.*)  In addition, Defendant offered Plaintiff the option of receiving a larger severance package if he signed a Release Agreement and advised Plaintiff to consult with an attorney before making his decision; the offer would remain open for twenty-one days.  (*Id.*)

Finally, the letter also explained that Plaintiff would be able to elect COBRA coverage,[18] and that Plaintiff would receive  information about COBRA directly from ADP, Defendant's COBRA administrator.  (*Id.*)  At the close of the meeting on July 25, 2003, Conliffe advised Plaintiff that he had to review the letter and attached waiver before leaving the meeting.  (Pl. Dep. at 30:6-15).  Plaintiff contends that Conliffe had invited him to the meeting on "false pretense" and, after quickly flipping through the documents he asked if he could leave and called Conliffe a "lying bitch."  (*Id.* at 30:16-24).  Plaintiff believed the time provided to review the documents was insufficient and did not agree to "sign away [his] legal rights."  (Pl. Dep. at 29:1-30:24; Df. Br. at 26).  Therefore Plaintiff declined to waive Defendant's liability.  (Pl. Dep. at 29:1-30:24; Df. Br. at 26).


## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-

---

[18]Plaintiff testified that he was provided a 1-800 number to call regarding his COBRA benefits.  (Pl. Dep. at 181:6-183:9).  He called the number twice, the first time he called he was provided information about the cost and he requested the requisite paperwork.  (*Id.*)  When he did not receive the paperwork, he called again.  (*Id.*)  Plaintiff contends he never received the paperwork he requested, but he did not recall calling again and he did not contact anyone at Pfizer for additional information.  (*Id.*)

moving party.  *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing that there is no triable issue of fact and demonstrated an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586; see also *Anderson*, 477 U.S. at 247-48.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold").

### B.  DISCRIMINATION CLAIM

The NJLAD, in relevant part, prohibits employers from refusing to employ, discharging from employment, or to discriminating against employees "in compensation or in terms, conditions or privileges of employment," because of their race.  N.J.S.A. 10:5-12(a).  In determining whether a member of a protected class has been subject to discrimination in violation of the NJLAD, New Jersey state courts "have looked to 'the substantive and procedural

standards established under federal law' for general guidance." *Gerety v. Atlantic City Hilton Casino Resort*, 184 N.J. 391, 398 (2005) (quoting *Viscik v. Fowler Equipment Co., Inc.*, 173 N.J. 1, 13 (2002)).  The two theories of discrimination for which an individual may obtain relief under Title VII – disparate treatment and disparate impact – are both cognizable under the NJLAD.  *Id.*

    Where, as here, a plaintiff asserts disparate treatment, New Jersey state courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gerety*, 184 N.J. at 398; *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 447 (2005).  Therefore, the plaintiff must first set forth a prima facie case of discrimination by demonstrating that: (1) he belongs to a protected class; (2) he was actually performing the job before the adverse employment action occurred; (3) he suffered an adverse employment action; and (4) that others not within the protected class did not suffer similar adverse employment actions.  *Zive*, 182 N.J. at 454; *El-Sioufi v. St. Peter's University Hosp.*, 382 N.J.Super. 145, 167 (App. Div. 2005).  The evidentiary burden at the prima facie stage is "rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent-i.e., that discrimination could be a reason for the employer's action." *Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir.1996).

    If the plaintiff succeeds in making a prima facie showing, the burden shifts to the employer to set forth some legitimate, non-discriminatory reason for the employment action. *Mogull v. CB Commercial Real Estate Group, Inc.*, 162 N.J. 449, 462 (2000).  The burden then shifts back to the plaintiff to demonstrate that the reason proffered by the employer was not the true reason for the employment action, but was merely pretext for discrimination.  *Andersen v.*

-24-

*Exxon Co., U.S.A.,* 89 N.J. 446, 492-93 (1982). "The plaintiff may meet this burden either by persuading the court directly 'that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 211 (1999) (quoting *Texas Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (internal quotations and citations omitted). Although the burden of production shifts throughout the process, at all phases the plaintiff "retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." *Id.*

Here, it is undisputed that Plaintiff meets the first and third prongs of the prima facie case. As an African-American, Plaintiff is a member of a protected class and he suffered an adverse employment action when he was terminated. As to the second prong, although Defendant contends it is "unclear" whether Plaintiff can demonstrate that he performed his job "in a manner that met his employer's legitimate expectations," (Df. Br. at 29, n. 9), the New Jersey Supreme Court has recently held that, in a termination case, the plaintiff need only demonstrate that he "was actually performing the job prior to the termination." *Zive*, 182 N.J. at 454. As the *Zive* Court explained, "performance markers like poor evaluations are more properly debated in the second and third stages of the burden-shifting test, they do not come into play as part of the second prong of the prima facie case." *Id.* at 455. Here, the evidence presented by both parties indicates Plaintiff was in fact performing his job up until the day he was terminated. Therefore, at issue is only whether Plaintiff can establish the fourth prong of the prima facie case – that similarly situated employees outside the protected class did not suffer similar adverse employment actions.

To demonstrate this element, Plaintiff points to his colleague Weitzenhofer, who is white, and whom Plaintiff contends Kube treated more favorably.  Plaintiff notes that Kube began supervising Weitzenhofer while he was on a PIP, and at the end of the period, Kube did not terminate Weitzenhofer's employment.  (Feher Cert., Ex. J).  Because Weitzenhofer, who worked in a position similar to Plaintiff's and was also supervised by Kube, was not terminated, Plaintiff is able to meet the modest requirement necessary to demonstrate the fourth prong of a prima facie case of discrimination.   Therefore, the analysis must advance to the next step.

At this stage, the burden of production shifts to Defendant to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). This burden has been characterized as "relatively light,"and "the employer need not prove that the tendered reason actually motivated its behavior[.]" *Id.*

Defendant asserts that it terminated Plaintiff's employment because he did not adequately perform his job during 2002 and he failed to meet the expectations set forth in the subsequent PIP.  Defendant contends that throughout the year and while on the PIP, Plaintiff missed deadlines, the quality of his work was inadequate or inaccurate, he did not communicate well with his colleagues or with Kube, he chose not to seek training to develop his communication skills as he had been advised to do, and he did not accept certain work assignments.  As evidence of Plaintiff's deficient performance, and of Kube's efforts to coach Plaintiff to improve, Defendant offers Plaintiff's notes from his meetings with Kube and Puttock, Plaintiff's 2002 performance review, the PIP, Kube's notes documenting Plaintiff's performance, and the July 11, 2004 memorandum addressed to Plaintiff summarizing his performance during the PIP.  Plaintiff

does not appear to challenge Defendant's ability to meet its burden at this step of the analysis. Therefore, the Court is satisfied that Defendant has met its burden of production in showing that it had a legitimate, non-discriminatory reason for terminating Plaintiff.

Having reached the final prong of the *McDonnell Douglas* framework, the Court must now inquire as to whether Plaintiff has set forth any evidence that gives rise to a genuine issue of for trial as to whether the reasons set forth by Defendant for Plaintiff's termination are merely pretext. To meet this burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal citations omitted). However, the plaintiff need not

> cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*Id.* at n.7. The factual dispute at issue is not whether the employer's reason for terminating the plaintiff was wrong, but whether discriminatory animus motivated the employer. *Id.* at 765.

-27-

Therefore,  "the plaintiff cannot simply show that the employer's decision was wrong or mistaken

. . . . Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its actions that a reasonable factfinder could rationally find them unworthy of credence."  *Id.*

However, "[b]ecause a motion for summary judgment is designed to go beyond mere

allegations, a certain degree of 'factual specificity is required of a party opposing such a

motion.'" *Heffron v. Adamar of New Jersey, Inc.*, 270 F.Supp.2d 562, 574 (DNJ 2003) (quoting

*Herbert v. Newton Memorial Hospital*, 933 F.Supp. 1222, 1229 (D.N.J.1996)); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Frey v. Pennsylvania Airlines*, 859 F.Supp. 137,

141 (M.D.Pa.1992); *Tozzi v. Union Railroad Company*, 722 F.Supp. 1236, 1239 (W.D.Pa.1989).

"It is well settled that only evidence which is admissible at trial may be considered in ruling on a

motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp.

474, 482 (citing Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458,

471 (3d Cir.1989) (Garth, concurring)).  Thus, a plaintiff opposing summary judgment "cannot

simply rely on 'vague', 'self-serving' statements which are 'unsupported by specific facts in the

record.'" *Heffron*, 270 F.Supp.2d at 574-75 (quoting *Herbert*, 933 F.Supp. at 1229).  Therefore,

in order to survive summary judgment, a plaintiff must point to "'concrete evidence in the

record'" to demonstrate the proffered reason for his termination was merely pretext.  *See id*.

(quoting *Herbert*, 933 F.Supp. at 1229); Fed.R.Civ.P. 56(e).

Here, it appears that Plaintiff points to several pieces of evidence that he contends

demonstrate that the reasons offered for his termination are merely pretext.  First, Plaintiff argues

that Kube "had a pattern or practice of avoiding contact with his African-American subordinates,

to their detriment," stating three African-American employees complained that Kube "'withheld important information,'" that he "left them 'out of the loop,'" and "he avoided contact" with them. (Pl. Br. at 8). Although Plaintiff provides no citation to support this statement, the record indicates that Conliffe's notes from her interviews state Reddick reported to her that "based on [Reddick's] conversations with Celia [Sloan], there were concerns about being kept in the loop," and that Reddick believed Sloan sought her assistance because Kube "was not providing her with any guidance or direction." (Cotz Cert., Ex. E). Conliffe's notes from her meeting with Harris also indicate that Sloan had told him that Kube did not communicate, that he took over meetings, and discounted opinions.[19]

However, because these statements are hearsay and, without an appropriate basis, would not be admissible at trial, they are not properly considered in deciding this motion. Fed. R. Civ. P. 56(e); *Maldonado v. Ramirez*, 757 F.2d 48, 50 (3d Cir. 1985); *El-Sioufi*, 382 N.J. Super at 164. Moreover, this evidence does not indicate whether Kube's actions had anything to do with Sloan's race, or even if the complaints about Kube related only to his treatment of her, or if they were complaints about his management style in general.

Plaintiff also points to Conliffe's notes from her interview with Harris that indicate "all non-minority colleagues love him [and] speak highly of him," and further states: "Not a good track record with regard to minorities." (Cotz Cert., Ex. F; Pl. Br. at 8-9). In deposition, Conliffe discussed her notes from the meeting with Harris, explaining that the latter statement

---

[19]The notes reflect Harris reported three points regarding his conversations with Sloan, however, the notes are handwritten and the second point is not fully legible. (Cotz Cert, Ex. F). It stated clearly that Kube "changes things," the remainder is unclear. (*Id.*) Plaintiff has quoted document as stating "changes things on a whim." (Pl. F. at ¶ 3).

came from Harris.  (Conliffe Dep. at 78:24-80:1).  Conliffe further explained that she believed the comment was "not so much about Marc Kube," but that it was a comment that anyone could "make about Pfizer in general" and that she understood the statement to be in the context of "what [the company should] do to make sure that [it] retains[s its] minority colleagues."  (*Id*. at 91:13-24).  Notably, neither Plaintiff nor Defendant submitted transcript of Conliffe discussing the former statement or any deposition transcript in which Harris addressed these alleged statements.  Therefore, as discussed above, without proper foundation, Conliffe's notes from her conversation with Harris are not admissible and thus not properly considered in deciding this motion.  Fed. R. Civ. P. 56(e); *Maldonado v. Ramirez*, 757 F.2d 48, 50 (3d Cir. 1985); *El-Sioufi*, 382 N.J. Super at 164.

Plaintiff further argues that Weitzenhofer, while on his PIP, "flourished under K[u]be but clearly at Plaintiff's expense."  (Pl. Br. at 8).  Although Plaintiff provides no citation or support for this statement, the Court assumes Plaintiff is referring to his allegations that Kube passed information to Weitzenhoffer rather than speaking to Plaintiff, that he reassigned Plaintiff's projects to Weitzenhofer without informing Plaintiff, and bypassed Plaintiff for information relating to Plaintiff's projects.  (Pl. Br. at 2).  However, Plaintiff provides no evidence or further detail in support of these allegations.  Plaintiff  cannot simply rely on such "'vague', 'self-serving' statements which are 'unsupported by specific facts in the record.'" *See Heffron*, 270 F.Supp.2d at 574-75 (quoting *Herbert*, 933 F.Supp. at 1229).

Next, Plaintiff argues that he "complained to Harris about what he perceived as Kube's racial bias," and despite the requirements of Pfizer's open door policy, Harris did nothing in response to Plaintiff's complaints.  (Pl. Br. at 3).  In support of this allegation, Plaintiff contends

-30-

"Harris did not deny that Plaintiff complained to him about being treated differently." (Pl. F. at ¶ 9). However, the citation upon which Plaintiff relies for this statement indicates Harris stated in deposition that he did "not remember having any conversations with [Plaintiff] where he said he was being treated unfairly because of his race." (Harris Dep. at 130:13-15). Although Plaintiff has misrepresented Harris's statement, the issue of whether Plaintiff complained the Harris about Kube's treatment of him because of his race is in dispute.

Similarly, Plaintiff's argument that "management's decision to send [Kube] for coaching – because he had 'difficulty managing people of color' – was an explicit admission of his racial bias," (Pl. Br. at 9), is an inaccurate recitation of the reasons provided in the record for the decision to have Kube work with an executive coach. Loder stated in deposition that "there were some concerns and conversations about behaviors perceived as [Kube] having some difficulties with managing people of color," and that her conversations with Conliffe and Puttock "were around the need for [Kube] to become more comfortable with managing people that were different than his own." (Loder Dep. at 280:6-17). Loder also reported that the group concluded Kube was averse to handling conflict with anyone, regardless of race, and needed to develop this skill. (*Id.* at 280:17-20). Therefore, according to Loder, they agreed Kube would benefit from working with an executive coach to improve his management style. (Loder Dep. at 52:2-8; 57:15-58:4, 280:6-20). This statement does not constitute an "explicit admission of [Kube's] racial bias," although the statements made by Loder in deposition may provide some indirect evidence that Kube may have harbored racial animus.

However, Plaintiff fails to refute several of the allegations that he was not adequately performing his job. Indeed, Plaintiff concedes that he failed to meet the objectives outlined in his

PIP, including the following: (1) Plaintiff submitted a "key issues deck" approximately three days late, leaving no time for Kube to review and discuss revisions with Plaintiff; (2) Plaintiff twice submitted inaccurate monthly reports and failed to correct errors identified by Kube; (3) Plaintiff did not adequately prepare to present the key issues deck to upper management and therefore only presented a portion of the final deck; (4) Plaintiff had difficulty writing the brand message for a particular project, had trouble explaining the goals of the program and the business rationale at a meeting, "had difficulty" requesting assistance from Kube, and attempted to delegate the task to another group; (5) Plaintiff had difficulty summarizing the key action steps in the brand's monthly sales commentary, requiring extensive input and direction from Kube and, in one instance, utilized the same action steps from the commentary drafted the month prior; (6) Plaintiff did not timely begin his assignments and therefore submitted urgent requests for information, forcing other colleagues "to scramble to meet [Plaintiff's] deadlines," once waiting twelve days to ask for inputs that had to be delivered the following day; and (7) rather than immediately calculate the 2004 market share for Zantac, as requested by Kube, Plaintiff argued the project should be delegated to another colleague "better suited to calculate the market share," and "[a]fter repeated follow-ups" by Kube, Plaintiff only partially completed and delivered the project a month after the information was sought.  (Kube Cert., Ex. D).

Plaintiff's arguments that Kube did not inform him documents required significant revisions, (Pl. Dep. at 146:6-13); that he discussed inaccuracies in his report with Kube, who agreed that Plaintiff should simply wait to "update those columns of numbers" in the next reporting cycle, ( *Id.* at 147:6-148:6); and that Kube provided him short notice to prepare to present the key issues deck, ( *Id.* at 148:7-149-23), do not negate the fact that Plaintiff failed to

meet those objectives.

Moreover, Plaintiff's argument that Kube never advised him of any performance deficiencies until he met with Kube and Puttock in January of 2003 and that Kube never coached him to improve his performance is belied by the evidence in the record. Indeed, Plaintiff concedes that Kube advised him of steps to improve his performance, including that Kube needed to see more of Plaintiff, and that Plaintiff needed to improve his communication skills, as outlined in Plaintiff's notes from his meetings with Kube and as set forth in the 2002 performance review and the subsequent PIP. Likewise, Plaintiff's argument that Kube "continued to avoid giving him the support, guidance and input he needed to improve and succeed," while on PIP, (Pl. Br. at 4), is contradicted by his statement in deposition that he "discussed the status of projects" with Kube during the sixty-day PIP. (Pl. Dep. at 144:17-23).

Although discrimination may "be inferred from the mere facts of differences in treatment," *Gerety*, 184 N.J. at 398, the evidence in the record does not indicate Kube treated Plaintiff differently than employees who were not African-American. Indeed, one of Plaintiff's primary complaints is that Kube failed to communicate with him and that he missed several folder reviews. However, the record indicates Kube missed several folder reviews with Weitzenhofer as well, and Plaintiff did not recall ever making an effort to schedule an appointment with Kube through his electronic calendar, to which he had access. Plaintiff also complains that his picture was posted at the security console after his termination, however, no discriminatory animus can be drawn from this act because it only occurred after Plaintiff attempted to gain access to the building after his termination, and after he had removed Defendant's property against instruction not to do so. Additionally, Plaintiff's picture was posted

next to photos of two other former employees, one of whom was not African-American.

　　　　After a careful and searching review of the record and the arguments set forth by Plaintiff and Defendant, the Court concludes the evidence in the record does not give rise to a contestable issue of fact as to whether the proffered legitimate, non-discriminatory reason for Plaintiff's termination was merely pretext or that Defendant was motivated by discriminatory intent in the decision to terminate Plaintiff's employment.   Although there is evidence in the record that indicates Kube may have had problems communicating with and managing African-American employees, most of that evidence is largely inadmissible and does not meet the requirements of Rule 56(e), therefore it cannot properly be considered in deciding this motion.  Moreover, Plaintiff has failed to contest the legitimate reasons set forth as the basis for his termination, including those enumerated above, therefore Plaintiff simply has not demonstrated any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  *Feuntes*, 32 F.3d at 765.  In short, there is nothing in the record that would provide a basis for a reasonable fact-finder to disbelieve the reasons proffered by Defendant for Plaintiff's termination, or that an invidious discriminatory reason was more likely than not the reason for Plaintiff's termination.  Accordingly, Plaintiff's claim for discrimination must be dismissed.


### C. RETALIATION CLAIM

　　　　The NJLAD also prohibits an employer from taking reprisals against an employee because the employee "opposed any practice or acts forbidden" by the NJLAD, because the

employee "filed a complaint, testified, or assisted in any proceeding" under the NJLAD.

N.J.S.A. 10:5-12(d).  A retaliation claim under the NJLAD also follows the *McDonnell Douglas*

burden-shifting framework.  Therefore, to prove a cause of action for retaliation under the

NJLAD, a plaintiff must first demonstrate that: (1) he engaged in a protected activity known to

the defendant; (2) the defendant subjected plaintiff to an adverse employment decision; and (3)

there was a causal connection between the two.  *Craig v. Suburban Cablevision*, 140 N.J. 623,

629-30 (1995).  If the plaintiff establishes a prima facie case of retaliation, the burden of

production shifts to the employer to articulate a "legitimate, non-retaliatory reason for the

adverse action." *Jamison v. Rockaway Township Bd. of Educ.*, 242 N.J.Super. 436, 445

(App.Div.1990).  If the employer proffers a legitimate reason for the adverse action, the burden

shifts back to the plaintiff to show that a retaliatory intent motivated the employer's actions,

either directly, by showing that a discriminatory reason more likely than not motivated the

decision, or indirectly, through evidence that the proffered reason is pretextual. *Woods-Pirozzi v.*

*Nabisco Foods*, 290 N.J.Super. 252, 274 (App.Div.1996).

　　　　Defendant argues that Plaintiff fails to establish a prima facie case of retaliation in

violation of the NJLAD because Plaintiff did not engage in protected activity, and moreover,

because Plaintiff cannot demonstrate a causal connection between his question at the company-

wide meeting, or his complaint to human resources about unfair treatment, and his placement on

a PIP and subsequent termination.  (Complaint at ¶ 28, 41).  In opposition to this motion,

Plaintiff only asserts that Defendant, through Kube, gave Plaintiff a "poor performance review"

and placed him on a PIP in retaliation for a question he posed about Pfizer's diversity strategies

to the Division President at a company-wide meeting.  (Pl. Br. at 7).  According to Plaintiff,

when he "asked why more wasn't being done to promote diversity within the CHP unit," (Pl. Br.

at 4), he "at least implicitly criticiz[ed Defendant's] discriminatory hiring practices," and the

short period of time between his question and "the first warning session" about his poor

performance review provides clear evidence of retaliation.[20]   (Pl. Br. at 7-8).

Plaintiff's argument does not support a prima facie case of retaliation.  As outlined above,

Plaintiff must first demonstrate that he engaged in a protected activity.  Specifically, the NJLAD

protects against employers taking

> reprisals against any person because that person has opposed any practices or acts
> *forbidden under this act* or because that person has filed a complaint, testified or
> assisted in any proceeding under this act or to coerce, intimidate, threaten or
> interfere with any person in the exercise or enjoyment of, or on account of that
> person having aided or encouraged any other person in the exercise or enjoyment
> of, any right granted or protected by this act.

N.J.S.A. 10:5-12 (emphasis added).  Although a plaintiff need not file a formal complaint of

discrimination to meet the first prong of the prima facie case, to constitute protected activity, the

opposition, complaint or protest, whether formal or informal, must clearly indicate a belief that

an act forbidden by the NJLAD has occurred.  *See DeJoy v. Comcast Cable Commc'ns Inc.*, 968

F. Supp. 963 (D.N.J. 1997).  In *DeJoy*, the court found the plaintiff's complaint that the decision

to remove him from salary status after suffering an aortic aneurysm was illegal, without

complaining of illegal discrimination, "too vague to be considered 'protected conduct.'" 968 F.

---

[20]   In the Complaint, Plaintiff alleges that Defendant terminated him in retaliation "for his
complaints of discrimination," without specifying what the nature of his "complaints of
discrimination" were.  In opposition to Defendant's summary judgment motion, Plaintiff only
argues that he was subject to retaliation in response to his questioning of the Division President
at the company-wide meeting.   Thus, to the extent that the complaint might be read as asserting
a retaliation claim based upon any other "complaints" that Plaintiff may have made, he has
clearly abandoned any such claim.

Supp. at 988. *See also Barber v. CSX Distribution Services*, 68 F. 3d 694 (3d Cir. 1995) (finding plaintiff's complaint of unfair treatment that did not explicitly or implicitly allege that age was the reason for the alleged unfairness did not constitute protected activity under the ADEA). Similarly, Plaintiff's question in this case – asking why Defendant was not doing more to promote diversity – was neither a complaint about, nor a statement in opposition to, practices or acts forbidden by the NJLAD, and therefore does not constitute protected activity. *See* N.J.S.A. 10:5-12(d).   In short, the NJLAD prohibits discrimination; it does not require an employer to take affirmative steps to promote diversity.  Therefore, a complaint about an employer's failure to take such steps cannot constitute protected activity under the NJLAD.  *Cf. Dzwonar v. McDevitt*, 177 N.J. 451, 464 (2003) (holding that "a plaintiff must set forth facts that would support an objectively reasonable belief that a violation [of at a law, rule, regulation or clear mandate of public policy] has occurred").

Plaintiff also argues that the posting of his photograph at the security consol and Defendant's failure to provide COBRA coverage provide further evidence of retaliation. However, as discussed in the section above, Plaintiff's reliance on these two points is misplaced. The posting of the photo occurred after Plaintiff attempted to renter the building and after his termination, and the record reveals that Plaintiff was provided information about obtaining COBRA insurance.   Therefore, neither of these arguments provide any support for Plaintiff's claim of retaliation.

Accordingly, because there is nothing in the record that raises a genuine issue of material fact regarding Plaintiff's claim that he was terminated in retaliation for his complaints of discrimination, Plaintiff's complaint of retaliation in violation of the NJLAD must fail.

**III. CONCLUSION**

For the reasons set forth above, the Court **grants** Defendants' motion for summary judgment and **dismisses** Plaintiff's complaint with prejudice.  An appropriate form of order will be filed.

       s/ Stanley R. Chesler
       Stanley R. Chesler, U.S.D.J.

Dated: September 28, 2007